### Texas & New Orleans Railway Company v. W. S. Scott.

Decided November 25, 1902.

**1.—Contributory Negligence—Assumed Risk—Brakeman.**

Evidence considered in an action by a brakeman for injuries resulting from a collision of trains and held to warrant a verdict in plaintiff's favor as against the defense of assumed risk and of contributory negligence, it being part of plaintiff's duty as rear brakeman to signal trains approaching as did the one that caused the collision.

**2.—Assumed Risk—Charge.**

In an action by a railroad employe for personal injury received in the service, a charge that an employe of a railroad assumes the ordinary and reasonable risks of his employment, and it is his duty to comply with the rules of the company in running its trains, is one of which the defendant can not complain.

**3.—Charge—Weight of Evidence.**

See charge held not to be on the weight of evidence in that it assumes that plaintiff flagged the approaching train that ran into his own and caused his injury, or assumes that his story of the transaction is true.

**4.—Burden of Proof—Charge.**

Where the court charged that "the burden of proof is on the defendant to establish its plea of avoidance set up in its answer by a preponderance of the evidence," an objection that the term "plea in avoidance" is unintelligible to the lay mind, and perhaps led the jury to believe that the burden of proof as to the entire case was on the defendant, can not be urged where the defendant failed to request a further charge amplifying and explaining such instruction.

**5.—Evidence—Compromise—Bias of Physician.**

Evidence that a physician who testified as a witness for the defendant railroad company examined plaintiff as to his injuries in contemplation of a compromise was admissible to show his bias, but not to show that a compromise had been offered.

Error from the District Court of Harris County. Tried below before Hon. W. P. Hamblen, Special Judge.

*Baker, Botts, Baker & Lovett* and *A. L. Jackson,* for plaintiff in error.

*Perry J. Lewis H. C. Carter, O. T. Holt,* and *J. M. Cobb,* for defendant in error.

GILL, Associate Justice.—This suit was brought by W. S. Scott against the Texas & New Orleans Railroad Company to recover damages

for personal injuries alleged to have been suffered by him as a result of the negligence of the servants of the company. A trial by jury resulted in a verdict and judgment for plaintiff, from which the defendant company has prosecuted this writ of error.

Plaintiff alleged that he was employed by the company as rear brakeman on one of its freight trains, and on the occasion in question, while the train on which he was at work was standing at the station of Sour Lake, the engine of another freight train was negligently run into the caboose on which he was at work, inflicting the injuries of which he complains. The negligence of the engineer and fireman on the engine which caused the injury is alleged to be responsible for the wreck.

The defendant pleaded in answer general denial, contributory negligence in failing to display signal lights on the caboose as provided by the rules, and in failing to go back the proper distance with signals for the purpose of stopping the approaching train, and in negligently and rashly going upon the caboose when the approaching train was in rapid motion near the caboose and the collision evidently inevitable. Assumed risk was also pleaded, predicated upon his alleged knowledge of the danger of going upon the caboose directly in front of the rapidly approaching train.

The plaintiff's cause of action, if he has one, rests in the facts testified to by himself, and are here set out in his own language: "I had been in the service of this defendant about ten years; part of the time as brakeman, and for eight years as a conductor. On the 10th day of December, 1899, I was rear brakeman on first section of train 246, which was a freight train. * * * We left Houston about 8 o'clock at night, and reached Sour Lake somewhere about 3 o'clock in the morning. When we reached Sour Lake we stopped for water; it was then about 3 o'clock a. m. on the 11th of December, 1899. While the train was standing in this position, with the engine taking water, the collision occurred between the second section of train 246 and the train I was on. I am familiar with the printed rules of the company, and identify the book of rules handed me as the rules of defendant company then promulgated and in force among the employes.

"Rule 97 reads as follows: 'When a freight train is detained at any of its usual stops more than three minutes, where the rear of the train can be plainly seen from a train moving in the same direction at a distance of at least fifteen telegraph poles, the flagman must go back with danger signals not less than one pole, and as much further as may be necessary to protect his train; but if the rear of his train can not be plainly seen at a distance of at least fifteen telegraph poles, or if it stops at any point that is not its usual stopping place, the flagman must go back far enough to be seen from a train moving in the same direction, when it is at least fifteen telegraph poles from the rear of his own train; and if his train should be detained until within ten minutes of

Vol. 30 Civil—32.

the time of a passenger train moving in the same direction, he must be governed by rule No. 99.'

"Rule 99 reads as follows: 'When a train is stopped by an accident or obstruction, the flagman must immediately go back with danger signals to stop any train moving in the same direction. At a point thirteen telegraph poles from the rear of his train he must place one torpedo on the rail; he must then continue to go back at least fifteen telegraph poles from the rear of his train, and place two torpedoes on the rail, ten yards apart (one rail length), when he may return to a point thirteen telegraph poles from the rear of his train, and he must remain there until recalled by the whistle of his engine; but if a passenger train is due within ten minutes, he must remain until it arrives. When he comes in he will remove the torpedo nearest to the train, but the two torpedoes must be left on the rail as a caution signal to any following train.'

"After arriving at the station of Sour Lake and after our train had stopped for water, I got off on the left-hand side and the conductor on the right to look over the train, which it was our duty to do; to examine the train for hot boxes or any damage. We started, and I guess went a distance of five, six, or eight car lengths when I heard the second section of train 246 coming, so I went over to the other side because it was level and better walking, and I went back with my white light, and when I got to the center of the caboose I began to flag the engineer of the second section to get an answer as soon as I could, so that I could go back and look around the train, and I kept going back towards the approaching train several car lengths, four, five, or six, or maybe seven car lengths; I do not exactly remember how far, but could not get any answer to my signals. I then turned and started back to the caboose with the intention of doing the next best thing, which was to get a red light and go back again until I could get a signal from the engineer. At the time when I turned to go back to the caboose for the red light, the engineer of the second section had not whistled for the wagon crossing, which was located about a mile west of Sour Lake station; he was more than a mile away, and he did not whistle for the station or whistle for the crossing, according to the rule; and as I went back and got on the platform of the caboose and got hold of the banister, the engine of the second section struck my caboose and me like lightning. Our train was going east, and the second section was going east. After our train stopped, and I had gotten off on the left-hand side, towards our engine, from five to eight cars, feeling for hot boxes, I heard the rear section coming, and went across on the other side and went back to the caboose, and as I got to the caboose began to flag with my lamp by waving it crossways over the track, and I continued going back for a distance perhaps of a telegraph pole beyond the caboose before stopping and going back for the red light. A red light is a danger signal when it stands stationary, and a white light, when stationary, is a signal of safety, but

a white light can be used as a danger signal by moving it in a certain way.  *  *  *

"The caboose of the first section at and just prior to the time of the collision had one red light up on each side, and a red light on the platform, and a white light in the cupola. I saw them. The engine drawing the second section of the train did not whistle as it approached the station on this occasion. It is a rule of the company for them to whistle; they generally whistle about half a mile before reaching the station. The engine drawing the second section gave no sound of the whistle from the time the first section stopped at Sour Lake up to the time the collision occurred. The engineer on the second section knew that the train I was on was in front of him.  *  *  *  The name of the engineer drawing the second section was Chris. Mortensen.  *  *  * The second section of train 246 at the time of the collision must have been running twenty miles per hour. When a train is running on a straight track at night, and a person is standing in front of it, he can not tell exactly how fast it is running. I saw the headlight of the second section for more than three miles before the collision occurred. The track is perfectly straight and level from Sour Lake to the west, so that the headlight of an approaching engine moved very little, and it is difficult to tell how far it was, and how fast it was running. I permitted the approaching train to catch me in a collision on account of being deceived in the speed and general appearance, and because the train did not whistle for the wagon crossing, which was something over a mile west of Sour Lake station. The rear brakeman is ordinarily the flagman of the train; sometimes the conductor acts as flagman, but when a train stops for the purpose of taking water or getting orders, as on this occasion, the conductor goes forward to get orders, as Mr. Hoover did on this occasion, and the flagman mentioned in rule 97, who is to go back and flag an approaching train in accordance with said rule, is the rear brakeman. I was rear brakeman in the first section of 246, and saw the second section of the train at Liberty. We went out ahead of the second section from Liberty, and between Liberty and Sour Lake I would look back and see the headlight of the second train. At times we would run close together.

"At the time that we were going along feeling for hot boxes, after the train had stopped at Sour Lake, and when I heard the second section approaching, I looked back and supposed it was three or four miles from the station. The signal lights at the station at Sour Lake showed that there were orders for our train, and under these circumstances it was the duty of our conductor, Mr. Hoover, to go up to the telegraph office and get the orders. Perhaps the conductor could have walked to the telegraph station and gotten the orders and returned within five minutes, if he had nothing else to do, but sometimes it would take twenty minutes, and sometimes he would not get the orders for two hours. It probably took me two or three minutes to go from the caboose up on the left side of the train to the point that I was at when I heard

the rear section approaching. Our train, the first section, had about thirty cars in it, and our caboose was about a thousand feet west of the telegraph station. The position occupied by our train, the first section, was the usual position for taking water. The water tank was situated just west of the telegraph office. I knew before I started up the left-hand side of the train feeling for hot boxes that the conductor would have to and was going to the telegraph office for orders, and I could not tell how long it would take him to get the orders and return, and if I had not heard the rear train approaching when I did, it was my purpose to have gone up feeling for hot boxes until I met the front brakeman coming towards me, and it might have taken five to eight minutes for me to do this. When I heard the rear train approaching, I jumped across on the other side of my train, went back towards the caboose running, and when I got even with the caboose I commenced signaling with my lamp for the engineer of the second section, and kept giving these signals as I went back down the track beyond my caboose. The approaching train was making a roaring noise; I heard the wheels of it, and I heard the roaring of the engine. I heard no whistle or bell. Of course, I knew that this second section of the train was approaching and behind us before I heard it, and at the time that I heard it, I looked up and judged at that time it was two or three miles distant from me, and I thought that it was two or three miles away or further, because the whistle for the station would generally be sounded a half mile from the telegraph office, and the road crossing east of the station was more than a mile from it. I stopped going forward feeling for hot boxes in order to use extra precaution, as I always do, when I could possibly go to the rear end of the train to go to and flag an approaching train.

"I went back to flag the engineer as extra precaution, because if I had not done so the blame would have been on me; that is, the company would have blamed me for the accident. A red light is ordinarily known as a danger signal. There were two red lights or bull's eyes on each side of our caboose, and there was a red lantern on the rear platform of the caboose of the first section. After failing to get any response from the engineer of the first section, I turned and went back to the caboose with the view of getting a red light off the platform, intending then to go back and by the use of this red light endeavor to stop the second section, and did this because he was giving me no signal in response to mine, and just as I got on the platform and was about to get this red light the collision occurred. I had passed my caboose and gone back down the track a distance of four, five, or six car lengths beyond my caboose with my white light, and still, according to my judgment, at that time the approaching train had not reached the road crossing, which was over a mile from the point that I was at. Having received no signal in response to the one that I gave the engineer, I turned and went back to the caboose with the view of getting the red signal off the platform of the caboose so as to stop the rear section. At the time that

I thus turned and went back to get the red light, my supposition was that the engine and the second section were fully a mile west of where I was, and had not reached the road crossing. * * * As I went back to the caboose to get the red light, I heard the noise of the train rolling, and I knew that it was still coming, and that it was not standing still; there was no conflicting noise to prevent me from hearing it; my hearing was good and my eyesight was not bad. Trains running under rules generally run ten minutes apart. The rule in reference to this is rule 89, which reads as follows: 'Freight trains following each other must keep no less than ten minutes apart, except in closing up at stations or at meeting and passing points.'

"The second section of the train in approaching Sour Lake ought to have been under control, and the speed ought to have been reduced to twelve miles an hour, so that the engineer could have stopped it within a short distance. I climbed upon the steps of the caboose to get the light because it is ordinarily safer to do this than to go by the drawhead and reach over."

As to the lights upon the caboose, his act in going back with his lantern and signaling the approaching train, the speed of the latter, the failure of the latter to whistle or ring the bell, and plaintiff's inability to judge of its speed or nearness, he was fully corroborated by other members of his crew. Mortensen, the engineer on the approaching train, testified for the company that he was on the lookout and saw no lights on the caboose of the standing train, and did not see the signal made with the lantern.

Upon this state of the evidence counsel for the company insist that the trial court erred in refusing to instruct a verdict for the defendant. This contention is presented under the first, second, and third assignments of error. We think it clearly appears from the evidence that plaintiff violated no rule of the company with reference to the flagging of approaching trains. It is overwhelmingly shown that the caboose was properly lighted. The verdict of the jury settles the issue as to whether plaintiff went back the distance of a telegraph pole and gave a danger signal with his lantern. The defendant, then, is left but one contention which to our minds is debatable, namely, that plaintiff was aware of the approach of the train, knew he had received no response to his danger signal, knew or ought to have known that a collision was imminent, and having gone upon the caboose notwithstanding these facts, which he knew or ought to have known, he was guilty of contributory negligence, or else assumed the risk of his act.

The plaintiff, as the servant of the company, owed it the duty to be diligent and prompt in protecting its property and the lives of his fellow workmen, but it was not his duty to do this at the peril of his life, and he can not hold the company liable if in his zeal for his master or his fellow workmen he has knowingly or recklessly done so. The opposing theory is that plaintiff simply undertook to comply with his full duty as required by the rules, so as to acquit himself of blame in case

of accident; that in so doing he misjudged the speed and proximity of the approaching train, and was thus caught in a place of danger and injured. The testimony shows that he was misled as to the distance of the approaching train by reason of the failure to whistle for the crossing and the station, and that it was difficult if not impossible for one situated as he was directly in front of the approaching train to judge with any accuracy either the distance or the speed. That this was true is evidenced by the fact of the accident, for it is against human nature for one to act as he did unless he was acting in ignorance of the impending catastrophe. The jury have found that a reasonably prudent person would have been misled as he was, and that having been thus misled while in the exercise of ordinary care, he can not be held to have assumed the risk. That Mortensen was negligent can not be successfully questioned on this record, and it is equally plain that this negligence on his part not only served to mislead plaintiff but caused the accident and injury. While we are not insensible to the force and reasonableness of defendant's contention, we have concluded it is not a case which calls for the intervention of this court on the ground that the facts do not support the verdict, or that the latter is so manifestly against the truth of the case as to call for a reversal upon that ground.

We are thus brought to consider the remaining assignments of error which complain of errors committed upon the trial of such a nature as to interfere with a just result. By the fifth assignment appellant complains of the section of the court's main charge in which the jury are told, among other things, that if the jury believe the plaintiff was injured at the time and in the manner complained of in plaintiff's petition, to find for plaintiff. The objection urged is that it is error to refer the jury to the pleadings for the issues to be determined, and further, that the section of the charge in question tended to lead the jury to believe that there was no other issue to be determined than whether plaintiff was injured at the time and in the manner alleged. We regard this objection as hypercritical. The section of the charge should not be considered out of and away from its proper context and setting, and the main charge and special charges given, read as a whole, make it plain that the jury were expected to consider the defenses of defendant in the light of the explanatory instructions given in connection therewith. We do not mean to be understood as approving the practice of referring the jury to the pleadings for the issues to be determined. We simply hold that the charge, considered as a whole, does not do this.

The seventh assignment assails the following portion of the court's charge: "You are further instructed that an employe of a railroad assumes the ordinary and reasonable risks of his employment, and it is his duty to comply with the rules of the company in running its trains."

The objection urged is that it authorizes the jury to believe the plaintiff was justified in complying with the rules at all hazards, and that thus the defense of assumed risk is eliminated. It is much more prob-

able that the section of the charge complained of would have affected the plaintiff harmfully, for it is a charge that to comply with the rules devolved upon him absolutely, which is not the law. Failure to comply with a rule is not negligence per se. We think the error one of which the defendant can not be heard to complain.

By the eighth assignment the following portion of the charge is complained of as upon the weight of the evidence in that it assumes that plaintiff flagged the approaching train:

"If you believe from the evidence that the plaintiff's injury, if any, was the result of his own want of reasonable care and diligence at the time of such injury, and that he contributed to such injury in whole or in part, and that his want of reasonable diligence in flagging the train and getting on the caboose just before and at the time of the collision was a proximate cause of plaintiff's injury, and that he would not have been injured, except by his own negligent act, then you will find for the defendant, but you are charged in this connection, if the plaintiff immediately before and at the time of the collision (you taking into consideration all of the surroundings and circumstances) acted in a reasonably prudent and diligent manner in flagging the train, and in getting on the caboose platform in furtherance of his purpose to flag the train, and with a reasonably prudent purpose to carry out and comply with the rules of the company in attempting to prevent a collision, then his so acting would not be negligence on his part; notwithstanding such acts he may recover, and if you so believe you will find for plaintiff such damages as he suffered as heretofore instructed."

The charge complained of apparently comes within the principle laid down in Railway v. Williams, 40 Southwestern Reporter, 161; Railway v. Artuesy, 31 Southwestern Reporter, 319, and Railway v. White, 32 Southwestern Reporter, 322. Standing alone it is subject to the criticism directed against it. It is worthy of note, however, that in all the cases cited the fact apparently assumed as proven was nowhere else submitted. Smith's case, supra, was flagrant in this respect. But in the case under consideration the entire charge makes it perfectly plain that whether plaintiff flagged the train, or whether his story of the transaction was true, was left to the jury, untrammeled by any intimation from the court. The case of Railway v. Lemburg, 75 Texas, 61, is directly in point, and upon the authority of that case we hold the assignment untenable.

It is insisted that the court erred in giving to the jury the following section of his charge: "The burden of proof is upon the defendant to establish its plea of avoidance set up in its answer by a preponderance of the evidence."

The objection urged is that the term "plea of avoidance" is unintelligible to the lay mind, and perhaps led the jury to believe that the burden of proof as to the entire case was on the defendant.

It is plain to our minds that the error, if any, was negative, so far

as the objection urged is concerned, and it devolved on the company to amplify and explain it by a requested charge, if it cared to do so.

The court permitted plaintiff to testify that one of the physicians who testified as to the extent of his injuries examined him, looking to a settlement with the company. The physician himself was also permitted to state over objection that he examined plaintiff as a representative of the company and for the purpose named. Plaintiff in error complains of this for the reason that the willingness of the company to compromise, or any steps it took in that direction, should have been kept from the jury.

The proposition contended for is generally sound, but it was clearly permissible to show the physician's connection with the company for the purpose of showing his bias, and to this end the testimony was carefully limited by the court. No specific offer of the company was allowed to be detailed, and indeed it does not clearly appear whether the desire for a settlement was evinced by the plaintiff or defendant. There was no error in the action of the court complained of.

The case seems to have been fairly and correctly tried, and we do not believe we should interfere with the verdict on the facts. It is unnecessary to notice the remaining assignments in detail. We regard them as untenable. The judgment should be affirmed, and it is so ordered.

*Affirmed.*

Writ of error refused.